IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

    PLAINTIFF,

        *v.*

ONE 1984 GULFSTREAM
AEROSPACE G-1159A AIRCRAFT,
SERIAL NUMBER 445, WITH TAIL
NUMBER N158PC,

    DEFENDANT.

Civil Action No.

_____

## VERIFIED COMPLAINT FOR FORFEITURE

COMES NOW plaintiff United States of America and shows the Court the

following in support of its Verified Complaint for Forfeiture:

## NATURE OF THE ACTION

1.     This is a civil forfeiture action against a 1984 Gulfstream Aerospace G-1159A

    aircraft that is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and

    21 U.S.C. § 881(a)(6).

1

## THE DEFENDANT IN REM

2.  The defendant property consists of a 1984 Gulfstream Aerospace G-1159A aircraft, serial number 445, bearing tail number N158PC ("the Defendant Aircraft") that Special Agent Thor E. Whitmore ("Special Agent Whitmore") of the United States Department of Homeland Security, Homeland Security Investigations ("HSI") seized pursuant to a federal seizure warrant on or about January 9, 2018, at the Marina Municipal Airport, 781 Neeson Road, Marina, California.

3.  The Defendant Aircraft is presently within the jurisdiction and venue of the Court and is behind held by Customs and Border Protection ("CBP") at a secure location.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

5.  This Court has *in rem* jurisdiction over the Defendant Aircraft pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

6.  Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

## BASIS FOR FORFEITURE

7.  The Defendant Aircraft is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it consitutes or is derived from proceeds traceable to "specified unlawful activity," specifically, dealing in a controlled substance.

8.  The Defendant Aircraft also is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it was furnished or was intended to be furnished in exchange for a controlled substance, it constitutes proceeds traceable to such an exchange, or it was used or was intended to be used to facilitate the sale or exchange of a controlled substance.

## FACTUAL BACKGROUND

9.  On April 20, 2017, HSI agents in Northern Kentucky received information from HSI Orlando that a private aircraft flying from California to Lexington, Kentucky the following day would potentially contain large amounts of United States currency.

10. On April 21, 2017, HSI Northern Kentucky Special Agents and an agents with the Kentucky State Police ("KSP") Special Investigations conducted surveillance on the airplane, identified as a Hawker 700A with tail number N18CC ("the Hawker"), after it landed at Lexington Bluegrass Airport.

3

11.   During a traffic stop of a vehicle that left the airport containing passengers from the Hawker, a trained and certified drug detection dog alerted to the presence of drugs on that vehicle.

12.   Agents conducted a search of the vehicle and found a bag containing approximately 20 kilograms of methamphetamine.

13.   Agents at Lexington Bluegrass Airport then conducted a free air sniff of the Hawker using a second trained and certified drug detection dog.

14.   The drug detection dog gave a positive alert for the odor of narcotics on the Hawker.

15.   Agents searched the Hawker and found three suitcases inside the airplane that contained a total of 80 kilograms of a substance that field-tested positive for cocaine.

16.   Agents arrested three passengers from the Hawker, identified as Robert Carlson ("Carlson"), Isaac Basilio Rosas ("Basilio Rosas"), and Cedric Fajardo ("Fajardo").

17.   On April 27, 2017, a grand jury in the Eastern District of Kentucky returned an indictment charging Carlson, Basilio Rosas, and Fajardo with conspiracy to possess with the intent to distribute cocaine and methamphetamine in

4

violation of 21 U.S.C. §§ 841 and 846 in *United States v. Carlson et al.*, 5:17-CR-56-KKC, EDKy.

18.     On June 1, 2017, grand jury returned a superseding indictment charging Carlson, Basilio Rosas, and Fajardo with conspiracy to distribute at least five kilograms of cocaine, conspiracy to distribute at least 500 grams of methamphetamine, and substantive drug charges in violation of 21 U.S.C. §§ 841 and 846.

19.     On July 21, 2017, Fajardo entered a plea of guilty to conspiracy to distribute at least five kilograms of cocaine.

20.     According to the plea agreement entered in his criminal case, Fajardo's anticipated sentence includes imprisonment for at least 20 years, based on a notice filed by the United States pursuant to 21 U.S.C. § 851, because Fajardo has a prior felony drug conviction. *See Carlson et al.*, 5:17-CR-56-KKC at Doc. 42.

21.     Carlson, Basilio Rosas, and Fajardo have each agreed to cooperate with the investigators in the hope of receiving reduced or more favorable sentences.

22.     HSI Special Agents in Kentucky have interviewed Carlson, Rosas, and Fajardo on multiple occasions.

23.    All three men admitted to being part of a drug trafficking operation.

24.    Each man independently explained that the operation involved transporting cocaine, methamphetamine, and marijuana via private airplanes from California to cities including Lexington, Louisville, New York, Charlotte, Atlanta, and Miami.

25.    The men told agents that they would then transport bulk currency that was the proceeds of drug sales from those cities back to California.

26.    As part of his interview with agents, Carlson admitted to being the leader and organizer of this operation.

27.    As part of their interviews, Basilio Rosas and Fajardo each admitted to acting as a drug courier.

28.    Carlson, Basilio Rosas, and Fajardo told the agents that they used various private planes and pilots to transport drugs and currency.

29.    According to Carlson, Basilio Rosas, and Fajardo, the Hawker was one of the most frequently-used airplanes to transport drugs and drug proceeds.

30.    Based on interviews and reviews of the flight logs for the Hawker, Carlson's organization used that aircraft on at least ten separate trips to transport drugs or drug proceeds across the country.

6

31.     According to the Aircraft Registration Inquiry database maintained by the
        Federal Aviation Administration ("FAA"), the registered owner of the
        Hawker is Juliet Bravo LLC, 16192 Coastal Highway, Lewes, Delaware.

32.     According to publically available records and FAA database information,
        Robert Earl Wallace ("Wallace") and two other individuals organized Juliet
        Bravo, LLC in Delaware on or about October 21, 2014.

33.     The Aircraft Registration Application sent to the FAA to register the Hawker
        in the name of Juliet Bravo LLC shows that Wallace signed the application
        as "member."

34.     Among supporting documents that Wallace submitted with the Aircraft
        Registration Application for the Hawker was a form entitled LLC Statement
        in Support of Registration for Juliet Bravo LLC.

35.     The LLC Statement in Support of Registration form includes a section asking
        the applicant to list "[t]he name of each of the members of the LLC and the
        type of entity of each member (i.e.,: individual, corporation, partnership,
        etc.)."

36.     According to the LLC Statement in Support of Registration, which Wallace
        signed as "member," the members of Juliet Bravo LLC are Robert Wallace,

7

individually, and the two other individuals listed on the Statement of Organization for the company.

37.    During the search of the Hawker that led to the seizure of 80 kilograms of cocaine, agents found miscellaneous paperwork, including a "dry lease agreement" for the Hawker that Wallace signed as "Managing Partner" of Juliet Bravo LLC.

38.    During their interviews with HSI agents, Carlson and Fajardo identified Wallace as the pilot on at least eight separate trips that transported drugs or drug proceeds.

39.    During their interviews with HSI agents, Carlson, Basilio Rosas, and Fajardo each independently opined that Wallace had full knowledge that the airplanes he was flying were loaded with drugs or drug proceeds.

40.    According to Carlson, Wallace noticed the smell of marijuana on one early trip and noticed that bags were suspiciously heavy on another.

41.    At that point, Carlson told Wallace the true purpose of the trips and offered to pay Wallace large amounts in cash to continue doing them.

42.    According to Carlson, he then paid Wallace between $28,000 and $38,000 per trip, which netted Wallace $10,000 to $18,000 after expenses.

8

43.   From his training and experience as well as information provided by others familiar with chartered airline service providers, Special Agent Whitmore believes that this is significantly higher than the usual rate paid for a charter pilot and airplane.

44.   Carlson told the agents that he would give Wallace cash or deposit cash directly into Wallace's bank account for the use of the Hawker on flights transporting drugs.

45.   During his interview with agents, Fajardo corroborated Carlson's claims, reporting that he once saw Carlson give Wallace $18,000 in cash before a flight.

46.   Carlson told the agents that in addition to serving as a pilot, Wallace participated in loading and unloading bags of drugs and money, packed marijuana, and once drove a load of marijuana.

47.   On July 20, 2017, at approximately 5:30 p.m., Carlson called Wallace, and agents recorded the telephone call.

48.   Wallace told Carlson that he was being careful and that "clearly someone ratted [Carlson] out."

49. During the call, Wallace confirmed that he still had possession of the Hawker.

50. Wallace also stated that he was happy he was not involved in the trip that led to Carlson's arrest and that under different circumstances, he would be in jail with Carlson.

51. Wallace also asked if the government had done anything with Carlson's phone.

52. When Carlson answered negatively, Wallace said "good."

53. On October 6, 2017, a grand jury in the United States District Court for Eastern District of Kentucky returned an indictment charging Wallace and others with conspiracy to distribute at least five kilograms of cocaine and conspiracy to distribute at least 500 grams of methamphetamine in violations of 21 U.S.C. §§ 841 and 846 in *United States v. Matthews et al.*, 5:17-CR-118-KKC, EDKy.

54. The indictment includes a forfeiture allegation listing the Hawker as property subject to forfeiture on the grounds that it was used to facilitate Wallace's drug-trafficking violations.

10

55. On November 2, 2017, pursuant to a seizure warrant, HSI agents seized the Hawker.

56. That same day following the seizure of the Hawker, HSI agents read Wallace his Miranda Rights, and Wallace agreed to speak with the agents without an attorney present.

57. Agents recorded the interview with Wallace.

58. During the interview, Wallace admitted to flying for Carlson on his many trips.

59. Wallace told the agents that he suspected Carlson was transporting narcotics as early as 2014.

60. Wallace stated that his partners liked flying for Carlson because of the lucrative trips and the money they made from them.

61. During this interview, agents asked Wallace about the Defendant Aircraft, which Wallace purchased earlier in 2017 in the name of Poppa Bravo LLC of 412 N. Main Street, Suite 100, Buffalo, WY 82834.

62. On July 18, 2017, HSI Atlanta uncovered information that Wallace had purchased the Defendant Airplane.

11

63.    Until that date, the Kentucky special agents were unaware that Wallace had purchased the Defendant Aircraft.

64.    According to documents obtained from Insured Aircraft Title Service, LLC, an escrow company Wallace hired to handle the transaction, Wallace purchased the Defendant Aircraft on or about April 29, 2017, from Dan Furlong, who is President and CEO of the Maintenance Group, Inc., located at Peachtree DeKalb Airport, which is in the Northern District of Georgia.

65.    According to the Aircraft Purchase Agreement, Wallace, as Managing Partner of Poppa Bravo LLC, agreed to pay The Maintenance Group, Inc. $365,000 for the Target Airplane, with a $35,000 deposit to be paid to Insured Aircraft Title Service, Inc. as the escrow agent.

66.    From his investigation, Special Agent Whitmore has learned that Wallace purchased the Defendant Aircraft out of foreclosure and that as part of the sale, Wallace updated and improved the Defendant Aircraft.

67.    During his interview, Wallace told HSI Kentucky agents that he paid $35,000 towards the purchase of the Defendant Aircraft and that his partner with Poppa Bravo LLC paid the remaining balance of $364,750.

12

68.   Documents from Insured Aircraft Title Service, LLC show that Poppa Bravo
      LLC wire transferred $358,780.54 and a company known as MKF Holdings
      LLC (not Wallace) transferred $35,000 to the escrow agent for the purchase
      of the Defendant Aircraft.

69.   The documents also include emails wherein the escrow company refers to
      Wallace as the purchaser.

70.   The emails further state that, on the day the transaction closed, "the buyer
      is at the bank right now sending the funds" and that the escrow company
      "still need[s] two forms from him but he said he will sign them when he gets
      back to office or home."

71.   The documents also include the Aircraft Registration Application that
      Wallace signed and supporting documents sent to the FAA to register the
      Defendant Aircraft.

72.   Among the supporting documents were forms entitled LLC Statement in
      Support of Registration for Poppa Bravo LLC and for MFK Holdings, LLC.

73.   Each LLC Statement in Support of Registration form includes a section
      asking the applicant to list "[t]he name of each of the members of the LLC

13

and the type of entity of each member (i.e.,: individual, corporation, partnership, etc.)."

74. According to the LLC Statement in Support of Registration for Poppa Bravo LLC, which Wallace signed as "member," the members of Poppa Bravo LLC are Robert E. Wallace, individually, and MFK Holdings LLC, as an "LLC/Corp."

75. According to the LLC Statement in Support of Registration for MFK Holdings, which is signed by Katherine Kennedy as manager, the only member of MFK Holdings, LLC is Katherine Kennedy.

76. The documents also include the Articles of Organization for Poppa Bravo LLC, which were filed with the Wyoming Secretary of State's Office on February 15, 2017, i.e., one week before Wallace, as managing partner of Poppa Bravo LLC, signed the Aircraft Purchase Agreement for the Defendant Aircraft.

77. Wallace's name does not appear on the Articles of Organization for Poppa Bravo LLC or on the records on file with the Wyoming Secretary of State's Office, despite Wallace signing the purchase agreement as managing partner.

14

78.   During an interview with HSI Kentucky agents, Carlson stated that he told Wallace to establish the LLC in Wyoming and to open a bank account in the Caymen Islands.

79.   From his familiarity with the investigation and based on the purchase and registration documents, Special Agent Whitmore believes that Wallace is the owner of the Defendant Aircraft registered in the name of his organization, Poppa Bravo LLC.

80.   During the interview, Wallace told agents that he used the funds derived from transporting bulk cash and narcotics for Carlson to purchase the Defendant Aircraft.

81.   Wallace further admitted to structuring the funds he made from Carlson to under $10,000 deposits so as not to meet the reporting requirements.

82.   Wallace was released on bond from the Eastern District of Kentucky.

83.   Wallace continued to pilot the Defendant Aircraft in a charter business.

84.   However, as a term of his bond, Wallace is restricted to operating the Defendant Aircraft within the borders of the United States.

85.   From his investigation, Special Agent Whitmore learned that the Defendant Aircraft was Wallace's possession in Marina, California.

86.   On November 29, 2017, Special Agent Whitmore obtained a seizure warrant for the Defendant Aircraft from the United States District Court for the Northern District of Georgia.

87.   Special Agent Whitmore was unable to be execute and seize the Defendant Aircraft within the 14-day period allowed by law.

88.   From his training and experience, Special Agent Whitmore knows that an airplane's logbooks are the most vital piece of the aircraft as they show, among other things, flight time, engine use, and maintenance of the jet engines, airframe structure and mechanics, and avionics.

89.   From his investigation, Special Agent Whitmore learned that the Defendant Aircraft's logbooks were not likely stored onboard the aircraft because there are multiple logbooks covering the history of the aircraft since 1984.

90.   On January 4, 2018, Special Agent Whitmore obtained a seizure warrant for the Defendant Aircraft and all of its logbooks from the United States District Court for the Northern District of Georgia.

91.   On January 9, 2018, at approximately 9:00 a.m., Special Agent Whitmore, HSI Kentucky Special Agent Michael Romagnoli ("Special Agent

16

Romagnoli"), and other law enforcement officers went to the Marina Municipal Airport to execute the seizure warrant for the Defendant Aircraft.

92. Agents entered the hangar where the Defendant Aircraft was stored through an open door.

93. Agents observed a male, who operates a business there, inside the hangar.

94. Special Agent Whitmore asked if the male was allowed access to the hangar, and he replied, "Yes, I do have access to the hangar."

95. Inside the hangar, Special Agent Whitmore observed the Defendant Aircraft, which was the only aircraft located there.

96. Special Agent Whitmore executed the seizure warrant and seized the Defendant Aircraft.

97. Special Agent Romagnoli contacted the lead Assistant United States Attorney handling Wallace's criminal case in Kentucky and asked him to contact Wallace's criminal defense attorney about the seizure of the Defendant Aircraft.

98. Special Agent Romagnoli also called Jeff Crechriou ("Crechriou"), who is the manager of the Marina Municipal Airport, and asked him to come to the hangar.

17

99.  At approximately 9:25 a.m., Crechriou arrived at the hangar and met with the agents.

100.  Special Agent Whitmore provided Crechriou with a copy of the seizure warrant authorizing the agents to seize the Defendant Aircraft.

101.  Agents asked Crechriou if he knew where the logbooks and maintenance records for the Defendant Aircraft were kept, and Crechriou stated that the items were likely in Wallace's office located on the other side of the hangar.

102.  Agents and Crechriou walked to where Wallace's office was located, and they found that the door to the office was locked.

103.  Special Agent Whitmore asked Crechriou if he was given access to Wallace's office, and Crechriou said yes and that he had a key for the door.

104.  Special Agent Whitmore asked Crechriou for consent to enter the office to seize the logbooks for the Defendant Aircraft, and Crechriou consented.

105.  Crechriou left the scene and then returned with the key to the office door.

106.  Crechriou unlocked the office door and allowed the agents to enter the office.

18

107.  Inside the office, Special Agent Whitmore observed 18 plastic containers that were labeled with a number and a description of its contents and four additional plastic containers that were not labeled.

108.  Special Agent Whitmore observed that all 22 plastic containers contained records pertaining to the Defendant Aircraft, including the logbooks for the Defendant Aircraft's engines.

109.  Special Agent Whitmore seized the 22 plastic containers.

110.  Agents loaded the 22 plastic containers into the cargo hold of the Defendant Aircraft.

111.  Special Agent Whitmore gave Crechriou a copy of the seizure warrant.

112.  At approximately 11:20 a.m., Special Agent Whitmore, Special Agent Romagnoli, and two pilots, who are certified to fly a Gulfstream airplane and were provided by the Kentucky State Police, boarded the Defendant Aircraft.

113.  The pilots flew the Defendant Aircraft back to Atlanta, landing at Peachtree DeKalb Airport at approximately 8:30 p.m. that same day.

114.  The Defendant Aircraft is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or was derived from proceeds traceable

to a specified unlawful activity, namely, the illegal distribution of a controlled substance.

115. The Defendant Aircraft also is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it was furnished or was intended to be furnished in exchange for a controlled substance, it constitutes proceeds traceable to such an exchange, or it was used or was intended to be used to facilitate the sale or exchange of a controlled substance.

WHEREFORE, the United States prays that:

1) The Court forfeit the Defendant Aircraft to the United States of America;

2) The Court award Plaintiff the costs of this action; and

3) The Court grant such other relief as the Court deems just and proper under the facts and circumstances of this case.

This ___19th___ day of January, 2018.

Respectfully submitted,

BYUNG J. PAK
   *United States Attorney*
   *600 U.S. Courthouse*
   *75 Ted Turner Drive SW*
   *Atlanta, GA 30303*
   *(404) 581-6000  fax (404) 581-6181*

MICHAEL J. BROWN
   *Assistant United States Attorney*
Georgia Bar No. 064437
michael.j.brown@usdoj.gov

21

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

PLAINTIFF,

v.

ONE 1984 GULFSTREAM
AEROSPACE G-1159A AIRCRAFT,
SERIAL NUMBER 445, WITH TAIL
NUMBER N158PC,

DEFENDANT.

Civil Action No.

_____

## VERIFICATION OF COMPLAINT FOR FORFEITURE

I, Special Agent Thor E. Whitmore of the United States Department of Homeland Security, Homeland Security Investigations, have read the Complaint for Forfeiture in this action and state that its contents are true and correct to the best of my knowledge and belief based upon my personal knowledge of the case and upon information obtained from other law enforcement personnel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This  *19*  day of January, 2018.

SPECIAL AGENT THOR E. WHITMORE
Department of Homeland Security
Homeland Security Investigations